# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**METAVANTE CORPORATION,**

      **Plaintiff,**

v.                                                                    **Case No. 05-C-1275**

**MEDAVANT, INC. f/k/a
PROXYMED, INC.,**

      **Defendant.**

## DECISION AND ORDER

The present case involves a trademark dispute in which the plaintiff, Metavante Corporation (the "Plaintiff"), has brought suit against MedAvant, Inc. (the "Defendant") for trademark infringement under 15 U.S.C. §§ 1114(1) & 1125(a) and trademark dilution under 15 U.S.C. § 1125(c). This suit was filed shortly after the Defendant changed its name from "ProxyMed, Inc." to "MedAvant, Inc." The Plaintiff has motioned for a preliminary injunction to bar the Defendant's use of the name "MedAvant" during the course of this litigation.[1]

---

[1] The Plaintiff, without seeking permission from this Court and pursuant to no Civil Local Rule, submitted a supplemental brief in support of its motion for a preliminary injunction on April 4, 2006. The Defendant filed a Rule 7.4 Motion to strike the supplemental brief. The Court agrees with the Defendant, and strikes the Plaintiff's supplemental brief. Civil Local Rule 7.1 governs the briefing of motions, and unless the Court grants permission, the parties' briefs are limited to what is provided in that

1

## BACKGROUND

**The Plaintiff Metavante's Business**

The Plaintiff, Metavante, is a wholly-owned technology subsidiary of Marshall & Ilsley Corporation ("M&I"), a publicly-traded bank holding company headquartered in Milwaukee, Wisconsin. (Swearngan Dec. ¶ 2.) In 1964, as M&I began providing data processing services to correspondent banks, the entity now known as Metavante was formed under the name "M&I Data Services" ("MIDS") to perform M&I's new data processing services. (*Id.* at ¶ 4.) In 1967, MIDS initiated the first remote bank processing operation in the United States, and it also performed the first official TYME transaction at an ATM in Wisconsin in 1976. (*Id.* at ¶ 5.) More recently, beginning in the 1990's, MIDS created technologies allowing for internet banking transactions over the internet. (*Id.* at ¶ 6.)

In early 2000, MIDS decided to rename itself "Metavante." On July 5, 2000, Metavante applied for a trademark registration in the United States for the mark "Metavante," and on February 4, 2003, the United States Patent and Trademark Office registered the mark "Metavante" for technology and services pertaining to financial transactions.[2]

---

rule.

In addition, Civil Local Rule 7.1(f) provides that the parties' principal briefs cannot exceed 30 pages, and the reply brief cannot exceed 15 pages. Nevertheless, the Plaintiff submitted a reply brief that was 26 pages in length, and the Defendant submitted a principal brief that was 34 pages in length. While the Court considered their briefs in their entirety for purposes of deciding this motion, the Court directs both parties to follow the Civil Local Rules in the future.

[2] The Plaintiff's trademark in "Metavante" was registered for the following goods and services:

2

Starting in 2003, the Plaintiff began acquiring companies that expanded its services and technology into the healthcare industry. First, on December 9, 2003, the Plaintiff purchased Printing For Systems, Inc. (PSI), which is a provider of identification cards to the healthcare industry. (Swearngan Decl. ¶ 19.) Second, on May 6, 2005, the Plaintiff announced the acquisition of Advanced Financial Solutions, Inc. (AFS), which is a check-imaging technology provider. (*Id.* at ¶ 20.) Third, on May 10, 2005, the Plaintiff acquired Med-i-Bank, Inc. ("MBI"), which is a payment services company targeting employee benefit and consumer-directed healthcare accounts ("CDHCs"). (*Id.* at ¶ 21.) And finally, on November 22, 2005, the Plaintiff announced the purchase of Adminisource Corporation ("Adminisource"), which is a provider of health care payment distribution services.[3] (*Id.* at ¶ 23.) The Plaintiff claims that these four acquisitions developed a full product line specifically intended to target and serve the healthcare industry under the name "Metavante."

> Computer software and technology implementation consulting for financial service providers; bill payment services.
>
> Computer software for use by financial services providers to conduct electronic banking, trust accounting, electronic funds transfers, electronic bill presentment and payment, and financial transaction processing, including ATM, credit and debit card transactions; computer software for use by financial services providers to manage customer relationships; computer software for customer statement formatting.
>
> Providing outsourced services for others in the field of financial services and software.
>
> TM #2684696

[3] Despite announcing the acquisition of Adminisource on November 22, 2005, it appears the Plaintiff did not actually acquire Adminisource until January 3, 2006, which was after the Plaintiff filed its complaint in this lawsuit. (Lettko Decl. ¶ 4.)

3

These acquisitions allowed the Plaintiff to administer CDHCs and health saving accounts ("HSAs"). The CDHCs and HSAs that the Plaintiff administers allow patients to save money in an IRA-like account to pay for all deductible healthcare expenses. (Lettko Decl. ¶ 32.) Specifically, the Plaintiff provides the necessary technology to allow the patient to transfer money from his HSA or CDHC to the treating doctor by presenting a debit card for payment. (*Id.* at ¶ 34.) The Defendant, MedAvant, claims that its business in the healthcare industry is much different than the one conducted by the Plaintiff.

**The Defendant MedAvant's Business**

The Defendant, who now uses the name "MedAvant," originally was incorporated in 1989 under the name "ProxyMed" as a technology provider for pharmacies. (*Id.* at ¶ 3.) Today, the Defendant has expanded to become an organization that hosts a Preferred Provider Organization ("PPO"), which is a network of doctors who offer their services at a discount to insurance companies who direct patients to them. (*Id.*) The Defendant also hosts a national health insurance claims clearinghouse. (*Id.*) The Defendant's clearinghouse ensures that the electronic claims submitted by physicians and other providers of care are in the correct format for receipt by insurance companies. (*Id.*) In addition, the Defendant offers electronic prescribing technology and services that allow doctors to send prescriptions and authorizations for prescription refills electronically. (*Id.*) The Defendant also provides technology and services that enable diagnostic labs to electronically send lab reports to hospitals and physicians. (*Id.*) The Defendant's business does not include services related

4

to HSAs and CDHCs, nor does it offer payment services of any kind. (*Id.*)

On December 2, 2005, ProxyMed changed its name to "MedAvant Healthcare Solutions." (*Id.* at ¶ 1.) Less than a week later, the Plaintiff filed a complaint, alleging that the use of the "MedAvant" name was a trademark infringement, in violation of 15 U.S.C. §§ 1114(1) & 1125(a), and a trademark dilution, in violation of 15 U.S.C. § 1125(c). Shortly thereafter, the Plaintiff filed a motion for a preliminary injunction to bar the Defendant's use of the name "MedAvant."

## DISCUSSION

A preliminary injunction is an extraordinary and drastic remedy, and the party seeking a preliminary injunction bears a high burden of persuasion. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To succeed on a motion for a preliminary injunction, the moving party must first make a threshold showing of "(1) some likelihood of prevailing on the merits, and (2) an inadequate remedy at law and irreparable harm if preliminary relief is denied." *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir. 1994). If this threshold is met, the Court must then also consider "(3) the irreparable harm the nonmovant will suffer if preliminary relief is granted, balanced against the irreparable harm to the movant if relief is denied; and (4) the public interest, meaning the effect that granting or denying the injunction will have on nonparties." *Id.*

### A. Trademark Infringement

A party seeking a preliminary injunction for trademark infringement is likely to

5

succeed on the merits if it can demonstrate a likelihood of consumer confusion. *Promatek Indus. Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002). The Seventh Circuit has outlined seven factors to consider in evaluating the likelihood of confusion:

> (1) the similarity between the marks in appearance and suggestion, (2) the similiarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's.

*Id.* None of these factors are dispositive, and the appropriate weight given to each factor will depend on the circumstances of each case. *Id.*

The first factor, the similarity of the marks, weighs in the Plaintiff's favor. To determine the similarity of trademarks, a court may look to the sound, sight and meaning of the marks. *See Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 355-56 (7th Cir. 1983). Here, "Metavante" and "MedAvant" are quite similar in spelling, having only two minor distinctions: "MedAvant" uses a "d" instead of a "t" and it also lacks an ending "e." These minor spelling changes have little effect phonetically as "Metavante" sounds very similar to "MedAvant" when spoken. Furthermore, the meaning of "MedAvant" cannot be sufficiently different from that of "Metavante" because neither "MedAvant" nor "Metavante" are actual words. Therefore, the two marks are very similar.

The second factor requires the Court to weigh the similarity of the products. Federal registration of a trademark is *prima facie* evidence of ownership, validity and the exclusive right to use the mark "in commerce on or in connection with the goods or services specified

6

in the registration subject to any conditions or limitations stated therein." 15 U.S.C. § 1115(a). As mentioned above, the Plaintiff's trademark in "Metavante" is limited to technology and services pertaining to financial transactions. In contrast, the Defendant processes insurance claims submitted by healthcare providers. Thus, the Plaintiff's trademark cannot be used as *prima facie* evidence that the Plaintiff and the Defendant offer similar products and services because the Plaintiff's trademark does not cover those products and services offered by the Defendant. The Plaintiff may still succeed in demonstrating a similarity of products and services, but bears the burden of demonstrating such a similarity.

The Plaintiff concedes that its operations were unrelated to the healthcare industry for many years, but contends that it has targeted the healthcare industry beginning in late 2003 by acquiring PFS, AFS, MIB, and Adminisource. However, none of these subsidiaries provide a competing product with that of the Defendant. Based upon the evidence presented by the Plaintiff, it is unclear how a consumer might confuse the Plaintiff's products with that of the Defendant. That is not to say that a reasonable consumer might not confuse the products as a result of the marks being similar; the Plaintiff just has not made a clear showing that this is likely to occur.

The third factor in determining the likelihood of confusion concerns the area and manner of concurrent use of the products. This factor considers the channels of commerce used by the parties in marketing and selling their products. *See Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990). While the Plaintiff has appeared with the

7

Defendant at a couple different trade shows, the Plaintiff's participation was through MBI, one of the its subsidiaries, and no reference was made to "Metavante" on the vendor list. (Lettko Dec. ¶ 9, Ex. B.) The Plaintiff contends, though, that it is working toward integrating its healthcare-related subsidiaries under the "Metavante" moniker and will begin distributing business cards, marketing materials, and attending trade shows using this name. (Swearngan Dec. ¶ 6, Ex. B.) The Court also takes judicial notice that the Plaintiff has filed an application with the United States Patent and Trademark Office after filing this action to expand its trademark protection to the field of "healthcare administration."[4] In essence, it appears that the Plaintiff and the Defendant are now in a race to use their respective marks in similar marketing channels.

It is not an uncommon occurrence for companies to race to the market with similar trademarks, but there is a vast distinction between when one company has an established use over the other and when neither company has an established use. The Plaintiff has not provided convincing evidence that, prior to initiating this suit, it has used the "Metavante" mark in similar streams of commerce to that of the Defendant. Lacking a demonstration of an established use in a given market, a party bringing suit for trademark infringement may still have protection in "product markets in which it does not now trade but into which it might reasonably be expected to expand in the future." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir. 1992). Nevertheless, the Plaintiff has provided no

---

[4] Trademark Application No. 78787315 was filed on January 9, 2006.

8

Case 2:05-cv-01275-RTR   Filed 05/05/06   Page 8 of 12   Document 78

evidence to indicate that it might expand its product line to those that compete directly with the Defendant. As such, this factor must weigh in favor of the Defendant.

The fourth factor to consider in analyzing a likelihood of confusion is the sophistication of the consumers. The more a consumer is likely to research a product before purchasing it, the less likely the consumer is to confuse different trademarks. *See AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 827-28 (7th Cir. 2002). The Defendant submits evidence demonstrating that it averages between ninety to 180 days to complete each sale. (Lettko Dec. ¶ 15.) This implies that a great deal of care and research goes into the purchase of the products at issue and that the consumers are anything but "impulse buyers." Accordingly, this factor must also weigh in favor of the Defendant.

The fifth factor concerns the strength of the trademark itself. The stronger the trademark, the greater protection it receives from the courts. *Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d 1225, 1231 (7th Cir. 1993). The Plaintiff's trademark "Metavante" is a made-up word with no English language definition and must be given the strongest protection as a fanciful mark. *See Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 462 (7th Cir. 2000). However, "[t]he term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular . . . source." *Id.* at 464 (citations omitted). Because the focus of this factor is with regard to likelihood of consumer confusion, evidence of advertising and sales must be considered circumstantial and secondary to a showing of how consumers

9

perceive the mark. *See Platinum Home Mortgage Corp. v. Platinum Fin. Grp.*, 149 F.3d 722, 729 (7th Cir. 1998).

The Plaintiff has not met its burden in demonstrating the strength of its mark. While "Metavante" is a fanciful mark and the Plaintiff has gone through considerable length to detail its expense in developing the "Metavante" brand, the focus in determining the strength of a mark is on the relevant consumers. Here, the Plaintiff fails to address whether consumers in the healthcare industry would even recognize the Plaintiff's mark, let alone associate it with the Defendant's products. Accordingly, this factor must weigh in favor of the Defendant.

The sixth factor concerns evidence of actual confusion. The Plaintiff cites two examples it deems to be proof of "actual confusion," but the Court accords neither of the examples any weight. The Plaintiff claims that on two occasions, individuals expressed confusion about whether "MedAvant" referred to "Metavante." (Swearngan Dec. ¶ 10.) However, there is no evidence that either individual was a customer of either Metavante or MedAvant. Accordingly, this factor also weighs in favor of the Defendant. *See CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 686 (7th Cir. 2001) (according little weight to evidence of confusion when the person confused was not a customer).

And finally, the seventh factor considers whether the Defendant intended to pass itself off as the Plaintiff by using a similar name. The Plaintiff presented no evidence that the Defendant acted in bad faith when it changed its name to "MedAvant." Thus, this factor

10

weighs in favor of the Defendant as well.

After weighing all the evidence in light of these seven factors, the Court finds that the Plaintiff has not met its burden of demonstrating a likelihood of confusion. The Plaintiff, for nearly forty years, targeted an unrelated market and only entered the healthcare industry when it purchased four existing businesses that provide financial transaction services for doctors and patients. These services are not provided by the Defendant. Furthermore, the Plaintiff's trademark is not registered for use in the healthcare industry. Thus, based on what the Plaintiff has presented thus far, the Court finds that the Plaintiff has not made a strong showing that it is likely to succeed on the merits of its trademark infringement action.

### B.      Trademark Dilution

The Plaintiff also argues the Court should grant a preliminary injunction because it is likely to succeed on its trademark dilution claim. The Plaintiff asserts that, in order to win its trademark dilution claim, one element it must prove is that the name "MedAvant" is *likely* to cause dilution, citing *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000). However, the United States Supreme Court, in *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003), held that a plaintiff is required to make "a showing of actual dilution, rather than a likelihood of dilution." *Id.* at 433. The Supreme Court stated that "where the marks at issue are not identical, the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable dilution." *Id.* In this case, the Plaintiff offered no indication that it is likely to prove actual dilution of its

11

trademark. Accordingly, the Court cannot grant a preliminary injunction on the basis of the Plaintiff's trademark dilution claim either.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

Plaintiff's Motion for a Preliminary Injunction (Docket No. 4) is **DENIED**.

Defendant's Rule 7.4 Motion to Strike Supplemental Memorandum and Declaration (Docket No. 66) is **GRANTED**.

Dated at Milwaukee, Wisconsin this 5th day of May, 2006.

               **BY THE COURT**

               s/ Rudolph T. Randa
               **Hon. Rudolph T. Randa**
               **Chief Judge**